UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————

MACKS USA, INC., ET AL.,

                    Plaintiffs,              23-cv-7476 (JGK)

        - against -                          MEMORANDUM OPINION AND
                                             ORDER
UNITED STATES DEPARTMENT OF LABOR,
ET AL.,

                    Defendants.
————————————————————————————

JOHN G. KOELTL, District Judge:

    The plaintiffs, Macks USA, Inc. ("Macks") and Mujeeb

Rahman, brought this action seeking judicial review of an

Administrative Review Board ("ARB") Decision and Order (the "ARB

D&O"). In the ARB D&O, the ARB, a body authorized to issue final

decisions for the Secretary of Labor, affirmed the

Administrative Law Judge's ("ALJ's") decision (the "ALJ D&O")

upholding the Department of Labor's ("DOL's") initial

determination letter (the "WHD Letter") finding that the

plaintiffs owed back wages to Shaukakt Jalal, a former Macks

employee, and imposing a civil penalty on Macks and Rahman. The

defendants filed a counterclaim seeking to affirm the ARB D&O.

    The defendants now move for summary judgment affirming the

ARB D&O and dismissing the plaintiff's complaint. For the

following reasons, the defendants' motion for summary judgment

is **granted**.

**I.**

In deciding a motion for summary judgment under Rule 56, courts "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1] Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs. L.P., 22 F.3d 1219, 1223 (2d Cir. 1994). However, where "a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal, and the entire case on review is a question of law." Ass'n of Proprietary Colls. v. Duncan, 107 F. Supp. 3d 332, 344 (S.D.N.Y. 2015). Accordingly, the usual summary judgment standard under Rule 56 does not apply because the Court need only "address legal questions" to decide "whether the agency acted arbitrarily, capriciously or in some other way that violates 5 U.S.C. § 706." Id. Nonetheless, summary judgment is appropriate in APA cases because the questions on review are purely legal and are "amenable to summary disposition." Id.

Under the APA, courts review issues of law de novo, without any deference to an agency's interpretations of the statutes that the agency is charged with administering. 5 U.S.C. § 706 ("[T]he reviewing court shall decide all relevant questions of

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

law . . . ."); <u>Loper Bright Enters. v. Raimondo</u>, 144 S. Ct. 2244, 2261-63, 2273 (2024) (overruling <u>Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.</u>, 467 U.S. 837 (1984)). Pursuant to section 706(2), courts must "hold unlawful and set aside agency action[s]" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A)-(B), (E). "[A] district court's review under the arbitrary and capricious standard is limited to the administrative record." <u>Miller v. United Welfare Fund</u>, 72 F.3d 1066, 1071 (2d Cir. 1995).

## II.

### A.

This case concerns the H-1B visa provisions of the Immigration and Nationality Act (the "INA"), 8 U.S.C. § 1101(a)(15)(H)(i)(b) & § 1182(n), as amended by the American Competitiveness and Workforce Improvement Act (the "ACWIA") of 1998, Pub. L. No. 105-277, 112 Stat. 2681, 2681-641 (1998), the H-1B Visa Reform Act of 2004, Pub. L. No. 108-447, 118 Stat. 2809 (2004), and the DOL's implementing regulations at 20 C.F.R. Part 655, subpts. H & I. Descriptions of the relevant laws, regulations, and agencies follow.

**1.**

The H-1B visa program, enacted pursuant to the INA, allows employers to bring temporary workers to the United States under certain conditions to perform "specialty occupation[s]." See 8 U.S.C. § 1101(a)(15)(H)(i)(b). Congress has imposed standards on employers hiring H-1B workers. 8 U.S.C. § 1182(n). As relevant in this case, the H-1B program requires employers to pay H-1B workers a required wage rate: the higher of the actual wage or the prevailing wage level for the occupational classification in the area of employment. See § 1182(n)(1)(A). Congress delegated enforcement of these standards to the DOL. § 1182(n)(1)-(2).

As a precursor step in the process of obtaining an H-1B visa through the United States Citizenship and Immigration Services ("USCIS") and the Department of State, employers must submit a Labor Condition Application ("LCA") to the DOL and receive DOL certification. DOL, Labor Condition Application, https://flag.dol.gov/programs/LCA (last visited Nov. 4, 2024). When employers submit an LCA to the DOL, employers promise to pay the required wage rate and to provide certain working conditions. Id.; § 1182(n)(1)(A).

An employer must pay an H-1B employee the prevailing wage listed on the employee's LCA starting on the date the employee "'enters into employment' with the employer." 20 C.F.R. § 655.731(c)(6). An H-1B employee "'enter[s] into employment' when

4

he/she first makes him/herself available for work or otherwise comes under the control of the employer." 20 C.F.R. § 655.731(c)(6)(i). The obligation to pay wages continues even if an H-1B employee is not actually performing work—namely, even if the employee is in "nonproductive status" (i.e., is "benched")— except during certain specified types of nonproductive periods. See 8 U.S.C. §§ 1182(n)(2)(C)(vii)(I), (IV); 20 C.F.R. § 655.731(c)(7). The employer's obligation to pay the H-1B employee ends only once the approved period of the LCA expires, or if there has been a "bona fide" termination of the employment relationship prior to that time. See 20 C.F.R. § 655.731(c)(7)(ii).

Specifically, the H-1B employer must pay wages where "the H-1B nonimmigrant is not performing work and is in a nonproductive status due to a decision by the employer (e.g., because of lack of assigned work), lack of a permit or license, or any other reason except as specified in paragraph (c)(7)(ii) of this section." 20 C.F.R. § 655.731(c)(7)(i). In relevant part, an H-1B employer is excused from paying wages:

> If an H-1B nonimmigrant experiences a period of nonproductive status due to conditions unrelated to employment which take the nonimmigrant away from his/her duties at his/her voluntary request and convenience (e.g., touring the U.S., caring for ill relative) or render the nonimmigrant unable to work (e.g., maternity leave, automobile

accident which temporarily incapacitates the
nonimmigrant) . . . .

20 C.F.R. § 655.731(c)(7)(ii); see also 8 U.S.C. §

1182(n)(2)(C)(vii)(IV) (excusing payment of wages for

"nonproductive time due to non-work-related factors, such as the

voluntary request of the [employee] for an absence or

circumstances rendering the [employee] unable to work").

### 2.

The INA authorizes the Secretary of Labor to "establish a

process for the receipt, investigation, and disposition of

complaints." 8 U.S.C. § 1182(n)(2)(A). The INA further instructs

that "[t]he Secretary shall conduct an investigation under this

paragraph if there is reasonable cause to believe" that a

violation has occurred. See id.

The Secretary of Labor has delegated to the Administrator

of the Wage and Hour Division (the "Administrator") the

authority to perform all investigative and enforcement functions

enacted pursuant to the INA. See 20 C.F.R. § 655.800(a). DOL

regulations direct the Administrator to determine the scope of

investigations, providing, "[t]he Administrator, either pursuant

to a complaint or otherwise, shall conduct such investigations

as may be appropriate." 20 C.F.R. § 655.800(b).

Among other functions, the Administrator may commence an

"aggrieved party" investigation. See § 655.806. Such an

investigation requires the Administrator to make a reasonable cause determination and investigate any complaint filed by an aggrieved person or organization regarding an employer's failure to meet a condition specified in the LCA or an employer's alleged material misrepresentation in the LCA. See 8 U.S.C. § 1182(n)(2)(A); 20 C.F.R. §§ 655.805-07. The definition of "aggrieved party" in the H-1B context includes "[a] worker whose job, wages, or working conditions are adversely affected by the employer's alleged non-compliance with the [LCA]." See § 655.715.

A complaint by an aggrieved party must be filed not later than 12 months after the latest date on which the violation occurred. See 8 U.S.C. § 1182(n)(2)(A); 20 C.F.R. § 655.806(a)(5). "This jurisdictional bar does not affect the scope of the remedies which may be assessed by the Administrator." § 655.806(a)(5). "Where, for example, a complaint is timely filed, back wages may be assessed for a period prior to one year before the filing of a complaint." Id.

If the Administrator determines that an employer has violated its obligations under the statute, the Administrator files a written determination with the DOL setting forth its findings of violation. See 20 C.F.R. § 655.815(c). If the employer has violated the wage requirements under an LCA, the Administrator may order the employer to pay back wages to the H-

7

1B employee. <u>See</u> 8 U.S.C. § 1182(n)(2)(D); 20 C.F.R. § 655.810(a).

An employer may challenge the Administrator's determination by requesting a hearing with an ALJ. <u>See</u> 8 U.S.C. § 1182(n)(2)(B); 20 C.F.R. § 655.820(a)-(b). The ALJ then conducts an evidentiary hearing on the record. 20 C.F.R. § 655.825; 29 C.F.R. Part 18.

An employer may appeal the ALJ's decision to the ARB, 20 C.F.R. § 655.845(a), which is authorized to issue final decisions for the Secretary of Labor, <u>see</u> 77 Fed. Reg. 69378 (Sec'y's Ord. 02-2012) (Nov. 16, 2012). The ARB reviews the ALJ's factual and legal conclusions <u>de novo</u>. <u>See</u> 5 U.S.C. § 557(b); <u>Mehra v. W. Va. Univ.</u>, ARB Case No. 21-56, 2021 WL 6425032, at *2 (ARB Dec. 21, 2022).

**B.**

The following facts are taken from the certified administrative record ("AR") provided to the Court and are undisputed unless otherwise noted.

Macks is a New York-based information-technology consulting company that recruits and sponsors H-1B workers for placement at third-party client worksites. AR 417-18 (Rahman Dep. 16:24-17:3). Rahman is the sole owner of Macks. AR 425 (Rahman Dep. 24:13-20). In 2011, Macks filed an LCA with the DOL to employ ten H-1B workers as computer programmers in New York from

October 2, 2011 to October 1, 2014. AR 524-30. In the LCA, Macks attested that it would pay the workers $48,000 per year for their computer programming work in New York City. AR 526, 528. The DOL certified the LCA on May 9, 2011. AR 530.

Macks then filed a Form I-129 petition with USCIS to employ Jalal, a Pakistani national who originally came to the United States on a F-1 student visa in 2007, from March 9, 2012 through October 1, 2014. AR 534-36. USCIS approved the petition for the requested time period and issued an I-797A approval notice listing Macks as Jalal's employer. Id. Macks sent Jalal an employment letter indicating that Jalal's start date would be April 2, 2012 and that he would be based in the New York office. AR 538.

However, the plaintiffs did not offer Jalal work in New York or anywhere else in the United States. See AR 1002, 1006 (ALJ D&O, ALJ No. 2017-LCA-00013 (Mar. 31, 2022)) (rejecting the plaintiffs' testimony that in 2012 Macks offered Jalal a position in New York with Orabase Solutions, LLC ("Orabase")). From April 2012 to April 2014, Jalal searched for jobs on his own but was unable to obtain employment. AR 1001, 1005. Despite Jalal's willingness and readiness to work, Macks failed to provide him any work assignments. AR 1005-06. Macks did not pay Jalal any wages during this two-year period. AR 1001, 1007; AR 474 (Rahman Dep. 107:3-7).

Jalal eventually obtained work, without assistance from the plaintiffs, as a subcontractor at I Net Software Technologies Inc. ("I Net"). AR 1001. In April 2014, I Net found Jalal a position with Community Health Systems ("CHS"). AR 731 (Tr. of ALJ Hr'g at 53:1-5); 1006 (ALJ D&O). Although I Net located the opportunity, Macks signed the legally required paperwork approving Jalal's assignment with CHS. AR 733 (Tr. of ALJ Hr'g at 55:7-17). Within the month, Jalal moved to Tennessee and began working for CHS. AR 731 (Tr. of ALJ Hr'g at 53:1-5); 1006 (ALJ D&O).

Once in Tennessee, however, Jalal soon learned that CHS expected him to pay out of pocket for work-related interstate travel, including flights, hotels, and food. AR 734-37 (Tr. of ALJ Hr'g at 56:5-59:9). Jalal was not notified prior to taking the position that he would have to cover travel expenses out of pocket and that he would be reimbursed for only a limited portion of what he was required to pay. AR 735-37 (Tr. of ALJ Hr'g at 57:15-59:10). These unexpected expenses put Jalal in a "very difficult situation," and, as a result, he left the position after only two weeks. AR 734-35 (Tr. of ALJ Hr'g at 56:4-57:24); AR 999 n.7 (ALJ D&O).

After leaving CHS, Jalal sent Macks an email stating that he quit "because of some issue with family and some office work environment." AR 897 (Pltfs.' Ex. 1), 737 (Tr. of ALJ Hr'g at

60:16-25). Macks paid Jalal the prevailing wage for the two weeks he worked for CHS in Tennessee, but did not provide Jalal with pay stubs. AR 738-39 (Tr. of ALJ Hr'g at 60:18-61:6). Macks did not report these payments to the Internal Revenue Service ("IRS") and did not deduct taxes from these payments. AR 305 (ALJ Partial Summary Decision, ALJ No. 2017-LCA-00013 (June 26, 2020)).

After Jalal left CHS, Macks did not assign him any work or pay him again until August 2014, when Jalal found work with Cargill, another I Net client. AR 739-41 (Tr. of ALJ Hr'g at 61:7-63:16). In August 2014, Jalal relocated to Minnesota to begin his work assignment with Cargill, where he remained employed until February 2015. AR 741-44 (Tr. of ALJ Hr'g at 63:6-66:14). Rahman signed the necessary paperwork for Jalal to be employed by Cargill. See AR 743-44 (Tr. of ALJ Hr'g at 65:21-66:11). Jalal was paid for his six-month assignment with Cargill, but Macks sent late payments and deducted commissions from the amounts owed to Jalal. AR 744-45 (Tr. of ALJ Hr'g at 66:24-67:15); AR 1002 (ALJ D&O); see also AR 600-06 (corroborating documents). I Net sent the last payment directly to Jalal. AR 744-45 (Tr. of ALJ Hr'g at 66:24-67:15). Macks again failed to provide pay stubs, report these payments to the IRS, or deduct taxes. AR 745 (Tr. of ALJ Hr'g at 67:16-20); AR 305.

11

While Jalal was working for Cargill, in October 2014, Macks filed a new Form I-129 petition with USCIS to extend Jalal's H-1B status for another three years. AR 554-72. On March 26, 2015, USCIS denied Macks' petition, finding that there was insufficient evidence to establish that Jalal had maintained his H-1B status and that there was a qualifying employment position. AR 574-76; AR 608-11. From February 19, 2015, when Jalal's work assignment for Cargill ended, through March 26, 2015, when USCIS denied Macks' H-1B extension petition, the plaintiffs had no work for Jalal and did not pay him. AR 304-05.

In July 2015, Jalal filed a complaint with the Wage and Hour Division ("WHD") of the DOL that alleged, among other things, that Jalal did not receive the required wages set forth in the LCA. AR 157-59. The WHD investigated Jalal's complaint. AR 489-95 (WHD Letter). Based on its findings, on May 4, 2017, the WHD issued a determination letter finding that the plaintiffs had violated the H-1B provisions of the INA. Id. Among the various violations, the Administrator determined that the plaintiffs failed to pay Jalal the wages required by law. Id. The WHD assessed a civil monetary penalty of $2,500 and determined that the plaintiffs owed Jalal back wages in the amount of $151,266.40. AR 489.

## C.

### 1.

On May 18, 2017, the plaintiffs requested a hearing before an ALJ to appeal the WHD's determination. AR 1-3. Before the hearing was held, the Administrator filed a motion for partial summary decision on the claims that the plaintiffs failed to pay Jalal the required wages during his period of employment with Macks and that the plaintiffs owed Jalal back wages. AR 36-50. On June 26, 2020, the ALJ granted the Administrator's motion in part and denied it in part. AR 296-308. In the partial summary-judgment decision, the ALJ found that the plaintiffs had illegally benched Jalal without pay. AR 305-06. Accordingly, the ALJ awarded Jalal a total of $34,256.84 in back wages, plus interest, for the following three time periods: (1) April 28, 2014, to May 9, 2014 (when Jalal worked for CHS); (2) August 28, 2014 to February 18, 2015 (when Jalal worked for Cargill); and (3) February 19, 2015 to March 26, 2015 (when Macks benched Jalal without pay while his petition for an H-1B extension was pending). Id.

The ALJ ordered a hearing on three remaining issues of fact and law: (1) whether Jalal was entitled to back wages for the period from April 2, 2012 to April 25, 2014, and for the period from approximately mid-May 2014 to August 24, 2014; (2) whether the civil money penalties assessed by the Administrator were

reasonable; and (3) whether Rahman was individually liable. AR 306. Id.

By order dated August 18, 2020, the ALJ initially set the hearing date for November 5, 2020, and ordered the parties to submit pre-hearing submissions no later than October 9, 2020, twenty-seven days before the hearing date. AR 644-46. By order dated October 7, 2020, the ALJ adjourned the hearing to January 26, 2021, and stated that "[a]ll other deadlines tied to the hearing date, such as those in my August 18, 2020 Order, are amended to reflect the new hearing date." AR 648-49. The ALJ added that "the pre-hearing submissions, list of joint exhibits, and joint stipulation of facts originally due for October 9, 2020, will now be due Wednesday, December 30, 2020"—twenty-seven days before the hearing. AR 649 n.1.

On January 4, 2021, the ALJ issued an order adjourning the hearing a second time and setting a new hearing date: March 2, 2021. AR 655-56. The January 4, 2021 order further stated, "All other deadlines tied to the hearing date, such as those in my October 7, 2020 Order, are amended to reflect the new hearing date." AR 655. Although not expressly stated in the order, this set February 3, 2021—twenty-seven days before the hearing—as the time for the parties to submit evidence and witness lists in advance of the hearing. See AR 655.

14

On January 25, 2021, the plaintiffs sent relevant documents to the Administrator, but did not send the documents to the ALJ. See AR 635, 661. On January 26, 2021, the Administrator emailed the plaintiffs and advised that "[s]ince the hearing is now scheduled for March 2, 2021, the court's deadline for us to submit pre-hearing documents is now February 3, 2021." AR 661. Despite the Administrator's message, the plaintiffs did not submit the documents to the ALJ before February 3, 2021. See AR 635, 661.

In anticipation of the hearing, on February 18, 2021, the ALJ issued an order reminding the parties to email a list of hearing participants and PDF copies of the evidence they planned to present at the hearing to the ALJ by February 24, 2021. AR 633–34. The order "d[id] not preclude any party from filing a motion to exclude evidence that was not timely noticed or provided in accordance with the [January 4, 2021 Order]." Id.

On February 18, 2021, the Administrator submitted a motion in limine to preclude the plaintiffs from calling witnesses and introducing evidence that had not been timely disclosed. AR 635–39. The plaintiffs had not filed any pre-hearing submissions or provided the Administrator with a list of witnesses or exhibits they intended to introduce by that date. Id.

On February 24, 2021, the plaintiffs submitted to the ALJ's office the documents they intended to use at the hearing. AR

15

669–73. On the same day, the ALJ granted the Administrator's motion in limine and excluded the plaintiff's documents not submitted by February 3, 2021. AR 665–68.

On February 26, 2021, the plaintiffs requested a continuance so that they could submit additional witness names and evidence for the upcoming hearing. AR 669–73. The ALJ denied the plaintiffs' request based on the ALJ's previous orders setting the deadlines to submit evidence and the plaintiffs' failure to make a substantive argument as to why the hearing should be continued. AR 675–77.

At the March 2, 2021 hearing, the ALJ heard evidence from both the Administrator and Rahman, who proceeded <u>pro se</u>, appearing on behalf of himself and Macks. AR 684 (Tr. of ALJ Hr'g at 6:7–15). In addition to the time periods outlined by the ALJ in the previous order for partial summary decision, the DOL sought $113,515,60 in back wages for the periods during which Plaintiffs benched Jalal without pay: (1) April 2, 2012 to April 25, 2014 (the period between when Jalal was supposed to begin working for Macks and when he began working for CHS); and (2) May 12, 2014 to August 22, 2014 (the period between when Jalal left CHS until he began working for Cargill). AR 703–04 (Tr. of ALJ Hr'g at 25:18–26:25); <u>see also</u> AR 402–03. The Administrator also argued that Macks was an alter ego for Rahman and that

Rahman should be held individually liable for all back wages owed. AR 705 (Tr. of ALJ Hr'g at 27:1-7); see also AR 403.

Pursuant to the ALJ's prior orders, the ALJ precluded the plaintiffs from using any of their proposed exhibits during the hearing. See AR 679-888 (Tr. of ALJ Hr'g at 1-120). At the hearing, however, noting that the Administrator had received the plaintiffs' proposed exhibits by January 25, 2021, the ALJ ordered Rahman to submit by the end of the day a combined exhibit of documents titled Respondent's Exhibit 1. AR 690-94 (Tr. of ALJ Hr'g at 12:11-16:22). The ALJ stated that the evidence would then "be in the record," but that the ALJ would "issue an evidentiary order after th[e] hearing addressing any objections" made by the Administrator. AR 693-94 (Tr. of ALJ Hr'g at 15:20-16:22). On October 6, 2021, the ALJ ultimately admitted Respondent's Exhibit 1 into the evidentiary record. AR 943-45.

On March 31, 2022, the ALJ issued a decision and order finding in favor of the Administrator that: (i) ordered Macks and Rahman to pay Jalal an additional $113,515.60 in back wages, for a total of $147,781.44, including the wages awarded in the Partial Summary Decision Order, plus interest to be calculated by the Administrator; (ii) ordered Macks and Rahman to pay $2,500 as a civil money penalty; and (iii) found that Macks and Rahman's violations were willful, meaning both should be

proscribed from employing H-1B workers for two years. AR 996-1015.

**2.**

On May 2, 2022, the plaintiffs petitioned the ARB for review. AR 1020-25. The plaintiffs raised the following three arguments on appeal to the ARB: (1) Jalal's complaint to the WHD was time barred pursuant to 20 C.F.R. § 655.806(a)(5), and thus he was not entitled to any back wages from before July 2014 (twelve months from when Jalal filed his complaint); (2) the ALJ improperly disregarded evidence offered by the plaintiffs to demonstrate that Jalal was unavailable and unwilling to work and that he had refused work assignments offered by Macks; and (3) the ALJ misapplied the corporate veil-piercing standard and therefore Rahman should not be held individually liable. AR 1021-25; AR 1310, 1313, 1318.

On February 21, 2023, the ARB affirmed the ALJ's decision in full. AR 1304; see also Adm'r v. Macks USA, Inc., ARB Case No. 2022-0038, 2023 WL 2468398 (ARB Feb. 21, 2023). The ARB first determined that Jalal's complaint was not barred by any statute of limitations, and the Administrator had the jurisdiction to award back wages for the period prior to July 2014. AR 1313. The ARB noted that it has consistently held that a benching violation is considered a "continuing violation" which remains actionable for the duration of the employment

18

relationship as stipulated in the LCA. AR 1311. Because Jalal's complaint was filed on July 21, 2015, and the last instance when the plaintiffs failed to pay Jalal was on March 26, 2015, the ARB concluded that Jalal timely filed his complaint within one year of the last violation. Id.

The ARB also rejected the plaintiffs' contention that the ALJ erred in awarding back-wages from April 2012 to April 2014 because Jalal's decision to quit his job with CHS allegedly constituted an "intervening act" that broke the continuing violation. AR 1312. The ARB found that while Jalal quit in part for family reasons, the record supported the ALJ's conclusion that Jalal also quit due to conditions related to his employment with CHS, and thus agreed with the ALJ that Jalal was entitled to wages from Macks for this entire period. Id. Accordingly, the ARB concluded that the ALJ correctly found that the Administrator had jurisdiction to assess back wages beginning from April 2012 to March 2015 as a single continuing benching violation. AR 1313; see also 8 C.F.R. § 274a.12(b)(20) (authorizing H-1B employees "to continue employment with the same employer" while a request for an extension of their visa is pending "subject to any conditions and limitations noted on the initial authorization").

The ARB also rejected the plaintiffs' assertions that Jalal was unavailable to work, was unwilling to relocate for work, and

was offered a job at Orabase but refused the position. AR 1317.
The ARB found that the evidentiary record did not support the
plaintiffs' argument that Jalal was unwilling to relocate for
work because Jalal had promptly relocated for his job at Cargill
in Minnesota. AR 1315. Similarly, the ARB determined that the
record did not support Rahman's testimony that Macks had offered
Jalal a remote job with Orabase in 2012 but that he was
unwilling to relocate to work for Orabase in New York. AR 1316.
Accordingly, the ARB affirmed the ALJ's determination that the
plaintiffs had benched Jalal without pay in willful violation of
20 C.F.R. § 655.731(c). AR 1317.

Finally, the ARB concluded that the ALJ properly applied
New York law in piercing Macks's corporate veil and holding
Rahman individually liable for the back wages and the civil
monetary penalty owed by Macks. AR 1318-20.

### D.

The plaintiffs filed this action on August 23, 2023,
principally alleging that the ARB D&O was arbitrary and
capricious and violated the plaintiffs' rights under the Due
Process Clause of the United States Constitution. Compl. ¶ 1,
ECF No. 1. On the same day, the plaintiffs also filed an
emergency application for a temporary restraining order ("TRO")
and a preliminary injunction, asserting that Rahman would be
forced into bankruptcy in the absence of such emergency relief.

ECF Nos. 5-7. On August 24, 2023, this Court held a hearing on the plaintiff's application for a TRO. ECF No. 15. During the hearing, the DOL agreed to pause its collection efforts until there was a decision on the plaintiffs' motion for a preliminary injunction. See id. at 4-5. Accordingly, the Court denied the plaintiff's request for a TRO as moot. Id. at 5. On September 21, 2023, the Court heard oral argument on the plaintiffs' request for a preliminary injunction and denied that motion. ECF No. 30.

On November 6, 2023, the defendants filed an answer and counterclaim, seeking to enforce the DOL's final order and to collect the civil money penalty pursuant to the Federal Debt Collection Procedures Act ("FDCPA"). ECF No. 31.

The defendants now move for summary judgment on all issues. See ECF No. 50.

### III.

Pursuant to the APA, reviewing courts "uphold a decision by the ARB if it is not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A), or 'unsupported by substantial evidence,' id. § 706(2)(E)." Bechtel v. Admin. Rev. Bd., 710 F.3d 443, 445-46 (2d Cir. 2013). Under this deferential standard of review, courts "must assess, among other matters, 'whether the decision was based on a consideration of the relevant factors and whether

21

there has been a clear error of judgment.'" <u>Judulang v. Holder</u>, 565 U.S. 42, 53 (2011) (quoting <u>Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983) ("<u>State Farm</u>")).

In doing so, "a court is not to substitute its judgment for that of the agency." <u>State Farm</u>, 463 U.S. at 43. Where the "agency examines the relevant [information] and has set out a satisfactory explanation including a rational connection between the facts found and the choice made, a reviewing court will uphold the agency action." <u>Karpova v. Snow</u>, 497 F.3d 262, 268 (2d Cir. 2007). Thus, the test "is primarily one of rationality. If the [agency] based its order on substantial relevant evidence, fairly ascertained, and if it has made no clear error of judgment, this court is not authorized to overturn that order." <u>Rockland Cnty. v. U.S. Nuclear Regul. Comm'n</u>, 709 F.2d 766, 776 (2d Cir. 1983).

An agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider." <u>State Farm</u>, 463 U.S. at 43. Arbitrary and capricious decisions also include those that "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." <u>Id.</u>

"Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008); Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951). Courts may reject an ALJ's factfinding "only if a reasonable factfinder would have to conclude otherwise." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original).

The plaintiffs argue that the ARB D&O should be set aside because: (1) the agency misconstrued and misapplied the twelve-month statute of limitations pursuant to 20 C.F.R. § 655.806(a)(5); (2) the ARB D&O disregarded Rahman's testimony that Jalal was not always available for work; and (3) the agency misapplied New York corporate veil-piercing law. Pltfs.' Mem. of Law in Opposition ("Opp.") 7–16, ECF No. 56. The defendants disagree, contending that the ARB D&O was well-reasoned and supported by substantial evidence. Defs.' Mem. of Law in Support ("Mem.") 13–19, ECF No. 51; Defs.' Reply Mem. of Law ("Rep.") 2–7, ECF No. 57. Each of the plaintiffs' arguments is addressed in turn.

### A.

The ARB properly applied the twelve-month statute of limitations in this case. In the context of the H-1B visa program, some alleged employer violations are discrete, while

others are continuing. A benching violation—placing an employee
in a nonproductive status—falls into the latter category. Gupta
v. Jain Software Consulting, Inc., ARB Case No. 2005-0008, 2007
WL 1031365, at *3 (ARB Mar. 30, 2007). As a continuing
violation, benching remains actionable throughout the duration
of the employment relationship stipulated in the LCA. Id.;
accord Adm'r v. ME Global, Inc., ARB Case No. 2016-0087, 2019 WL
3293915, at *7 (ARB Mar. 22, 2019); Dedios v. Med. Dynamic Sys.,
Inc., ARB Case No. 16-072, 2018 WL 2927675, at *4 (ARB Mar. 30,
2018). The ARB's consistent holdings on this issue comport with
the express text of the regulation, which states that "back
wages may be assessed for a period prior to one year before the
filing of a complaint." § 655.806(a)(5). Logic and equity also
support this outcome: the law should not require an H-1B
employee to file a complaint against his employer—upon whom the
employee's legal status depends—while the employment
relationship stipulated in the LCA is continuing.

The ARB correctly applied this sensible standard in Jalal's
case. It is undisputed that Jalal filed his complaint within one
year after his employment relationship with Macks ended, well
within the limitations period to file a complaint alleging a
benching violation. See AR 1311. Because the complaint was
timely filed, the ALJ properly assessed back wages pursuant to §
655.806(a)(5) for the entire term of Jalal's employment

24

authorized by the LCA. Accordingly, the ARB's affirmance of the ALJ's decision was not arbitrary or capricious.

In response, the plaintiffs argue that the ARB acted arbitrarily and capriciously when it affirmed the ALJ's decision finding that no intervening act broke the continuing violation period. But the plaintiffs' contention is mistaken. Although an employee's voluntary decision to quit "due to conditions unrelated to employment" can break the continuing violation period, see 20 C.F.R. § 655.731(c)(7)(ii), there was no period of nonliability in this case.

It was not arbitrary or capricious for the ARB to find that the ALJ properly determined, based on the substantial evidence before him, that Jalal left CHS in part due to working conditions, meaning that the benching violation continued throughout April 2014, and no intervening act occurred. Rather, the ARB correctly determined that Jalal left CHS after two weeks because of both family reasons and conditions related to employment. Namely, the substantial evidence supported the finding that CHS required Jalal to pay for travel, lodging, and other expenses out of pocket. AR 1312.

Similarly, the payments made by Macks to Jalal did not constitute "cash wages paid" pursuant to 20 C.F.R. § 655.731(c)(2). To meet the regulatory requirements, "cash wages paid" must, among other things, be documented in the employer's

25

payroll records, reported to the IRS as wages paid to the H-1B employee, and include deductions for the necessary tax withholdings. § 655.731(c)(2). The ALJ properly rejected Rahman's testimony that he reported to the IRS payments made by Macks to Jalal because Rahman's testimony was unsupported by any documentary evidence. <u>See</u> AR 1004; AR 305. The ARB therefore correctly affirmed the ALJ D&O.

The plaintiff further contends that there is no evidence showing that working conditions played a larger role than family issues in Jalal's decision to quit his position at CHS. Based on this factual premise, the plaintiff presses the legal argument that quitting for any non-work-related reason constitutes a voluntary decision to quit, even when that decision is also based on conditions related to employment.

These arguments misconstrue the facts and the law. The record contains clear and direct evidence that Jalal quit based on working conditions: having to pay for travel expenses out of pocket. By contrast, the record contains scant evidence explaining the family reasons behind Jalal's decision to quit, even though Rahman cross-examined Jalal at the ALJ hearing. <u>See</u> AR 756-82 (Tr. of ALJ Hr'g at 78:11-104:5).

Moreover, both the ARB and the ALJ "set out a satisfactory explanation including a rational connection between the facts found and the choice made." <u>See</u> <u>Karpova</u>, 497 F.3d at 268. Both

26

decisionmakers concluded that because Jalal "also quit in part for reasons related to work, . . . Jalal's quitting his job at CHS d[id] not satisfy the unavailability exception to wage liability." AR 1314 (ARB D&O); AR 1006 (ALJ D&O concluding that Jalal "only left two weeks later due to working conditions requiring Mr. Jalal to pay for travel expenses out of pocket").

Both explanations rationally applied the law to the facts. An H1-B employer must pay wages during an employee's "nonproductive status due to a decision by the employer," "lack of a permit or license, or any other reason except as specified in paragraph (c)(7)(ii) of this section." 20 C.F.R. § 655.731(c)(7)(i) (emphasis added). In relevant part, paragraph (c)(7)(ii) excuses the employer from payment during an H-1B employee's "period of nonproductive status due to conditions unrelated to employment which take the nonimmigrant away from his/her duties at his/her voluntary request and convenience . . . or render the nonimmigrant unable to work." § 655.731(c)(7)(ii). The catch-all provision, "any other reason," resides in paragraph (c)(7)(i), not (c)(7)(ii), and thus indicates that the former should be read more expansively than the latter to include situations where an employee quits for both work-related and non-work-related reasons. Thus, it was not arbitrary or capricious for the ARB to affirm the ALJ's decision

finding that paragraph (c)(7)(i) applied throughout the employment period stipulated in the LCA.

Therefore, the plaintiffs remained liable for back wages throughout the employment period stipulated in the LCA. This continuing violation period was not interrupted by the brief employment stints with CHS and Cargill because Macks failed to comply with the regulatory requirements, such as reporting Jalal's wages to the IRS, and because Jalal did not quit his CHS assignment solely based on conditions unrelated to employment.

**B.**

Next, the plaintiffs contend that the ARB improperly disregarded Rahman's testimony that Jalal was not always available for work. But this argument is plainly false. The ARB accepted the ALJ's finding that Jalal was willing to relocate for work based on the reasoning set forth in the ALJ D&O and the testimony considered by the ALJ. AR 1314-15. And the ALJ expressly considered Rahman's hearing testimony, noting that "Mr. Rahman's testimony differed from Mr. Jalal's." AR 1002.

The ALJ simply carried out his adjudicatory role by making a credibility determination based on the entire record and accepted Jalal's testimony over Rahman's. AR 1005-06; see also Cichocki v. Astrue, 534 F. App'x. 71, 76 (2d Cir. Sept. 5, 2013) (summary order) ("Because the ALJ thoroughly explained his credibility determination and the record evidence permits us to

glean the rationale of the ALJ's decision, the ALJ's failure to discuss those factors not relevant to his credibility determination does not require remand."). Specifically, the ALJ found that Jalal was willing to relocate for work, especially to "New York, where he would have had access to a large Pakistani community," AR 1005, and because of "the uncontested fact that Mr. Jalal actually did move across the country twice for project work," AR 1006. Therefore, it was not arbitrary and capricious for the ARB to review and affirm the ALJ's decision, which plainly considered testimony from both Rahman and Jalal.

### c.

The plaintiffs further argue that the ARB acted arbitrarily and capriciously when it affirmed the ALJ's decision to pierce Macks's corporate veil and hold Rahman individually liable. Courts applying New York law "disregard the corporate form, or, to use accepted terminology, pierce the corporate veil, whenever necessary to prevent fraud or to achieve equity." Morris v. N.Y. State Dep't of Tax'n & Fin., 623 N.E.2d 1157, 1160 (N.Y. 1993). To pierce the corporate veil, a plaintiff must establish the following elements: "[1] that the owner exercised complete domination over the corporation with respect to the transaction at issue, and [2] that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the

veil." <u>Thrift Drug, Inc. v. Universal Prescription Adm'rs</u>, 131 F.3d 95, 97 (2d Cir. 1997).

The plaintiffs conceded before the ARB that "Rahman exerted complete domination over Macks," and thus contested only the second prong of the New York veil-piercing analysis. AR 1318. Before this Court, the plaintiffs contend that the ARB acted arbitrarily and capriciously because: (1) the ARB failed to consider that New York courts generally look for intent before piercing the corporate veil, and (2) the ALJ overlooked evidence that Macks and Rahman attempted to comply with the conditions set forth in the LCA.

These arguments are without merit because the ARB D&O carefully followed New York law. The ARB D&O stated, "[a]lthough intent to commit fraud or another wrong is 'one method of assessing whether the corporate form was sufficiently abused to permit veil piercing,' it is not required." AR 1320 (quoting <u>Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.</u>, 716 F. App'x 23, 28 (2d Cir. Nov. 16, 2017) (summary order)). This correctly restated the law: "<u>Morris</u> does not explicitly restrict the types of wrongs that may justify veil piercing to those committed purposefully," although a finding that there was "no 'evidence of an <u>intent</u> to defraud'" can weigh in favor of not piercing the corporate veil. <u>Am. Federated</u>, 716 F. App'x at 28 (quoting and adding emphasis to <u>Morris</u>, 623 N.E. 2d at 1162). Rather, a

30

court's decision to pierce the corporate veil "necessarily depend[s] on the attendant facts and equities." Morris, 623 N.E. 2d at 1160. "[S]ome showing of a wrongful or unjust act toward [the] plaintiff is required." Id. at 1161.

And although Macks obtained the H-1B visa for Jalal and when requested signed paperwork authorizing Jalal's CHS and Cargill assignments, it is undisputed that Macks and Rahman "left [Jalal] without work or pay for over two years," which the ALJ properly determined to be a willful violation of the INA. AR 1320. In its decision, the ARB also considered the ALJ's finding that Macks and Rahman failed to deduct taxes or provide paystubs for the brief periods that Macks did pay Jalal, preventing Jalal from finding another employer. AR 1320; see also AR 101-03 (USCIS request for evidence asking Macks to provide, among other items, "copies of [Jalal's] most recent pay statements"). Summed up, the ARB correctly determined that Rahman, who controlled and dominated Macks, used Macks to commit wrongs against Jalal.

Because the ARB applied the correct legal standard and the ARB's affirmance of the ALJ's decision to pierce the veil was supported by the substantial evidence in the record, the ARB's decision was not arbitrary or capricious.

**IV.**

The plaintiffs also contend that the ALJ improperly precluded the plaintiffs' evidence at the March 2, 2021 hearing

in violation of the plaintiffs' federal due process rights. Opp. at 16-18.

This argument fails. First, the plaintiffs waived this argument by failing to raise the issue before the ARB. The Court "will not consider it for the first time on appeal." Bechtel, 710 F.3d at 450. Second, there was no "erroneous deprivation" of the plaintiffs' due process rights "through the procedures used" by the ALJ in any event. See Mathews v. Eldridge, 424 U.S. 319, 335 (1976). The ALJ gave the plaintiffs notice and "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Id. at 333 (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)).

The plaintiffs in this case had over three years to compile and present evidence in response to the WHD Letter. See AR 1305, 1307. During the lead-up to the hearing, the ALJ provided ample time for the plaintiffs to submit witness lists and evidence and to respond to the DOL's motions. See AR 633, 662, 665-67, 674-77. In particular, although the ALJ's orders setting the pre-hearing deadline for the parties' submissions could have been clearer, the orders unambiguously set February 3, 2021 as that deadline. See AR 644-46, 648-53, 655. The ALJ also adequately warned the plaintiffs about the potential consequences of waiver and noncompliance. See AR 665-67, 674-77.

Moreover, several of the documents the plaintiffs sought to admit were considered during the hearing because they were submitted as joint exhibits or as Administrator exhibits. <u>See</u> AR 919-21. And despite the plaintiffs' untimely submission, the ALJ nevertheless allowed Rahman to introduce Respondent's Exhibit 1 into the evidentiary record after the hearing. AR 693-94 (Tr. of ALJ Hr'g at 15:7-16:22); AR 943. In the end, both the ARB and the ALJ considered Respondent's Exhibit 1 in reaching their respective decisions. <u>See</u> AR 1006; AR 1316. In short, the plaintiffs received due process.

### CONCLUSION

The Court has considered all of the parties' arguments. To the extent not specifically addressed, those arguments are either moot or without merit. For the foregoing reasons, the defendants' motion for summary judgment is **granted** and the ARB D&O is hereby **affirmed**.

The ARB D&O affirmed the ALJ D&O, AR 1304. The ALJ D&O ordered that "[t]he Administrator shall calculate the accrued interest on" the back wages owed by the plaintiffs. AR 1008, 1015. Accordingly, the defendants are directed to submit, within thirty (30) days of this Memorandum Opinion and Order, a report from the Administrator regarding the calculation of the accrued prejudgment interest on the back wages owed by the plaintiffs. The report should set forth a detailed account of the

Administrator's calculations and cite the authorities providing the interest rates applied by the Administrator. The report should also include the _per diem_ prejudgment interest amount that will accrue from the date the report is submitted until the date that judgment is entered in this case.

The Clerk is directed to close ECF No. 50.

**SO ORDERED.**

**Dated:    New York, New York**
**          November 8, 2024**

_____
John G. Koeltl
**United States District Judge**